# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FYRESTA G. TUCKER,  :

            Plaintiff,  :

      v.  :     C.A. No. 13-01246-LPS

CAROLYN COLVIN,  :
Acting Commissioner  :
of Social Security,  :

           Defendant.  :

---

Stephen A. Hampton, GRADY & HAMPTON, LLC, Dover, DE

      Attorney for Plaintiff.


Charles M. Oberly, III, United States Attorney, and Heather Benderson, Special Assistant United States Attorney, OFFICE OF THE GENERAL COUNSEL, Philadelphia, PA.

Nora Koch, Regional Chief Counsel, SOCIAL SECURITY ADMINISTRATION-REGION III OFFICE OF GENERAL COUNSEL, Philadelphia, PA.

      Attorneys for Defendant.


## <u>MEMORANDUM OPINION</u>


July 30, 2015
Wilmington, Delaware

*(signature)*

**STARK, U.S. District Judge:**

## I.    INTRODUCTION

Plaintiff Fyresta Tucker ("Tucker" or "Plaintiff") appeals from a decision of Carolyn W.

Colvin, the Acting Commissioner of the Social Security Administration ("Commissioner" or

"Defendant"), denying her claim for disability insurance benefits ("DIB") under Title XVI of the

Social Security Act, 42 U.S.C. §§ 401-33. The Court has jurisdiction pursuant to 42 U.S.C. §

405(g).

Presently pending before the Court are cross-motions for summary judgment filed by

Plaintiff and the Commissioner. (D.I. 9; D.I. 12) Plaintiff seeks an award of benefits for the

entire period at issue or, in the alternative, asks that the Court reverse and remand the

Commissioner's decision. (D.I. 10 at 20) The Commissioner requests that the Court affirm her

decision denying Plaintiff's application for benefits. (D.I. 13 at 20) For the reasons set forth

below, the Court will grant Plaintiff's motion for summary judgment and deny Defendant's

motion for summary judgment.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed her claim for DIB on March 1, 2010, alleging disability since May 4, 2009.

(D.I. 5 (hereinafter "Tr.") at 30) Her application was denied at the pre-hearing levels. (*Id.* at 14)

She appeared before an Administrative Law Judge ("ALJ") on June 5, 2012. (*Id.* at 28) During

this hearing, Plaintiff amended the onset date of the disability to September 28, 2009. (*Id.* at 32)

On June 26, 2012, the ALJ issued a decision against Plaintiff, and on May 14, 2013, the Appeals

Council denied Plaintiff's request for review. (*Id.* at 14, 2) Therefore, the June 26, 2012

1

decision of the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On July 17, 2013, Plaintiff filed a complaint seeking judicial review of the ALJ's June 26, 2012 decision. (D.I. 1) Subsequently, on January 30, 2014, Plaintiff moved for summary judgment. (D.I. 9) On April 2, 2014, the Commissioner filed a cross-motion for summary judgment. (D.I. 12)

## B.    Factual Background

### 1.    Plaintiff's Medical History, Treatment, and Condition

Plaintiff was fifty-four years old on her amended alleged disability onset date, or a person closely approaching advanced age. (Tr. at 32; *see also* 20 CFR 404.1563 and 416.963) She was fifty-seven years old – a person of advanced age – when the ALJ rendered the decision that is now the subject of review. (*Id.*)

Plaintiff has a high-school education and a two-year college degree. (*Id.* at 35) She is able to communicate in English. (*Id.*) Plaintiff has past relevant work history as an insurance claims processor, data entry clerk, insurance clerk, and child care operator. (*Id.* at 17) She last worked in December 2009 as an insurance claims processor. (*Id.* at 33) Plaintiff's relevant medical history is detailed below.

#### a.    Injury to Right Foot

Tucker has injured her right foot on three occasions since 2007 and has seen eight doctors to address the issue. In February 2007, a large co-worker stepped on her foot. (*Id.* at 367) X-rays showed a chip fracture, and surgery was performed in June 2007 to remove any fragments. (*Id.*) However, Tucker's pain in the area worsened, and in August 2007, she had a cheilectomy.

2

(*Id.* at 299)

In February 2008, Tucker re-injured her right foot when a co-worker stepped on it again. (*Id.* at 306) Linda L. Lawton, DPM, a podiatrist at Brandywine Foot Care, noted that Tucker felt her pain at this point was greater than it ever had been pre- or post-operatively, but the films of Tucker's foot were unavailable for review. (*Id.* at 306) In March 2008, Tucker returned to Dr. Lawton for a surgical consult and was diagnosed with capsulitis and joint pain. (*Id.* at 303) Dr. Lawton also noted that Tucker's labs showed an elevated rheumatoid factor. Given the severity of Tucker's pain, Dr. Lawton believed Tucker may have inflammatory arthritis. (*Id.*) Dr. Lawton recommended a rheumatology consult and an evaluation by the consulting physician for capsulitis. (*Id.* at 304)

In October 2008, Robert A. Gatter, M.D., from Delaware County Rheumatology, PC, evaluated Tucker and documented continued pain in her toe with limited motion and swelling in the area in which the surgery had been performed. (*Id.* at 367)

In May 2009, Tucker injured her foot for a third time when a co-worker stepped on the back of her shoe. (*Id.* at 295) Dr. Lawton noted that Tucker had decreased range of motion in both dorsiflexion and plantarflexion. (*Id.*) Additionally, the first metatarsal was structurally dorsiflexed and there was crepitus with range of motion. (*Id.*) Tucker reported that she had been in constant pain since this third injury. (*Id.*) After reviewing an x-ray that showed a lack of joint space at the dorsal third joint, Dr. Lawton recommended a joint replacement with an implant and a possible graft. (*Id.* at 296)

**b.     Hallux Rigidus**

In mid-July 2009, Tucker saw Paul C. Kupcha, M.D., for a second opinion. Dr. Kupcha

3

noted that Tucker walked with a limp on her right side, that she had limited motion of her toe, and that the tests were "excruciating and painful" for her. (*Id.* at 328) After examining Tucker's x-rays, Dr. Kupcha diagnosed her with hallux rigidus (i.e., stiff right great toe, *see* D.I. 13 at 2) and recommended viscosupplementation, interposition arthroplasty, and fusion – in contrast to Dr. Lawton's recommendation of replacement arthroplasty. (*Id.*) On August 4, 2009, Tucker elected to undergo another cheilectomy. (*Id.* at 330-31) At the end of that month, Dr. Kupcha noted that she was improving overall, there were no signs of complications, and the swelling in her right great toe was as was to be expected. (*Id.* at 322)

In late July 2009, Tucker visited Christopher Davis, D.O., and Robert F. Sing, D.O., at Springfield Sports Science Center. (*Id.* at 410) She began physical therapy there about one month after her August 4, 2009 surgery with Dr. Kupcha. (*Id.* at 411)

### c. Complex Regional Pain Syndrome ("CRPS")/ Reflex Sympathetic Dystrophy ("RSD")

Roughly five months after her August 4, 2009 surgery, Tucker began to see Gerald E. Dworkin, D.O., a pain management specialist at Delaware Valley Orthopedic and Spine Surgicenter. (*Id.* at 478) On January 7, 2010, Dr. Dworkin noted that Tucker was still in significant pain despite having undergone total surgery procedures and was making very little progress in therapy. (*Id.*) Although there were no significant abnormalities in the back, hip, or knee, he documented significant tenderness and burning dysesthesias in the right dorsum of her foot, discoloration, and mild swelling. (*Id.*) Dr. Dworkin diagnosed Tucker with Complex Regional Pain Syndrome, Type 1 ("CRPS")/ Reflex Sympathetic Dystrophy ("RSD")[1] and

---

[1]"RSDS/CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body.

recommended lumbar sympathetic blocks. (*Id.*) Dr. Dworkin administered no fewer than eleven of these blocks between January 27, 2010 and March 14, 2012. (*Id.* at 23-24, 337, 339-40, 466-69, 473-77, 630-34)

On March 31, 2010, Dr. Dworkin completed a RSD/CRPS Residual Functional Capacity ("RFC") Questionnaire indicating that Tucker had some work-preclusive limitations. (*Id.* at 333-336) He indicated that Tucker could walk less than one block, stand or walk less than two hours in an eight hour day, and sit for about two hours in an eight hour day. (*Id.* at 334) Furthermore, he indicated she could never twist, stoop, crouch, squat, or lift more than ten pounds. (*Id.* at 335) In light of these issues, Dr. Dworkin suggested that Tucker was capable of low stress jobs and would be absent about two days per month. (*Id.* at 336)

Six days after completing the questionnaire, Dr. Dworkin noted that Tucker had significantly improved with the help of sympathetic block injections but much of her pain had recurred. (*Id.* at 472) A physical examination revealed "continued warmth and swollen, distal, right, lower extremity with painful [range of motion] at the ankle." (*Id.*)

On May 28, 2010, Tucker's doctors at Springfield Sports noted that Tucker "does get significant relief with the injections." (*Id.* at 493) They also reported "[d]ecreased range of motion in the first digit. . . [and] [p]ain with palpation and hypersensitivity along the whole medial side of the foot." (*Id.*)

On July 26, 2010, Tucker saw Lee S. Cohen, D.P.M., who noted that at that time Tucker

---

Even a minor injury can trigger RSDS/CRPS. The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. . . . It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual." SSR 03-2P.

had had three injections but continued to have numbness and swelling in her toes and foot, could not propel off the foot, and experienced pain when putting weight on it. (*Id.* at 429) Dr. Cohen also noted that Tucker's x-rays indicated "some bone atrophy in the demineralization of the right foot compared with the left, which is consistent with crypt syndrome." (*Id.* at 430)[2] He diagnosed her with hallux rigidus in addition to chronic regional pain syndrome. (*Id.*) Dr. Cohen recommended Tucker continue with epidural treatments and suggested that once the crypt syndrome subsided, she should use a shoe insole or have a joint replacement. (*Id.*) For the time being, he planned to proceed with a custom orthotic with no platform since she had experienced pain with the platform in her current custom shoes. (*Id.*)

Tucker saw Dr. Cohen again on August 23, 2010. (*Id.* at 486) Dr. Cohen noted that there was no obvious sign of Grips Syndrome at that time even though Tucker was being treated for it. (*Id.*) The color, texture, temperature, and turgor of her skin were within normal limits. (*Id.*) He also indicated that Dr. Dworkin had decided to forego radiofrequency wave treatments for nerve pain and instead to continue with additional epidural blocks that Tucker felt were not effective. (*Id.*)

On August 28, 2010, Edgar E. Folk, III, M.D., performed an internal medicine examination of Tucker for Maryland Disability Determination Services. (*Id.* at 435) Dr. Folk noted the deformity of Tucker's great right toenail and generalized swelling over the dorsum of her right foot and great toe. (*Id.* at 436-37) He also documented Tucker's inability to move her toe and pain – even to very light touch – of her great toe and dorsum of her right foot. (*Id.*) Dr. Folk believed Tucker could return to work with proper treatment but suggested that her

---

[2]The Court understands Dr. Cohen's use of "crypt" and "Grips" to mean CRPS.

6

recuperation may take time. (*Id.* at 437)

On August 31, 2010, non-examining state agency physician A.R. Totoonchie, M.D., completed a physical RFC assessment of Tucker based on her file. (*Id.* at 439-46) He made note of Tucker's personal and third party accounts of her activities of daily living ("ADL"), finding them credible. (*Id.* at 444) He also recounted the highlights of Tucker's medical history, including her most recent clinical evaluation with Dr. Folk. (*Id.* at 446) Dr. Totoonchie concluded that, despite the diagnoses of RSD in her right foot, Tucker could occasionally lift 20 pounds, frequently lift ten pounds, stand for at least two hours total, and sit for six hours total in an eight-hour workday. (*Id.* at 440) Postural limitations were all occasional with the exception that she was never to climb a ladder, rope, or scaffold. (*Id.* at 441) No manipulative, visual, communicative, or environmental limitations were indicated. (*Id.* at 441-43)

On September 14, 2010, Tucker's doctors at Springfield Sports noted that she continued to experience constant severe pain and hypersensitivity in her right foot. (*Id.* at 492) The sensitivity was especially pronounced in her great toe, which she could not move at all and showed darkish discoloration. (*Id.*) They also documented that she limped with walker support and had a special shoe. (*Id.*) The doctors planned to proceed with a surgery to be performed by Dr. Cohen and to continue with the injections. (*Id.*)

Less than a week later, however, Dr. Cohen wrote to Dr. Sing that the planned surgical procedure was outdated and pointed out that Tucker had had problems with the same procedure in the past. (*Id.* at 483) He reiterated that it was unclear whether Tucker had CRPS or RSD and that Tucker was frustrated with the injections from Dr. Dworkin because she was not "seeing any real changes." (*Id.*) Dr. Cohen suggested that the surgery may be helpful if there were no indications

7

that Tucker had CRPS. (*Id.*)

On February 15, 2011, Dr. Sing saw Tucker and noted that she continued to experience severe, unrelenting pain over her right foot and great toe. (*Id.* at 656) Dr. Sing also indicated atrophy and discoloration of the toe. (*Id.*)

That same day Dr. Sing completed a RSD/CRPS RFC Questionnaire. (*Id.* at 645-48) He noted that Tucker's chronic, severe pain increased with activity and consistently affected her attention and concentration while performing even simple tasks. (*Id.* at 648) Dr. Sing concluded that Tucker could walk up to one block without pain, sit for less than two hours and stand for less than two hours total in an eight-hour workday, and would need to take ten minute breaks every 20 minutes. (*Id.* at 646-48) He further indicated that Tucker could never lift more than 20 pounds, could rarely lift ten pounds, and that extreme temperatures would adversely affect the injury. (*Id.* at 647-48) As a result of these issues, Dr. Sing believed Tucker was capable of low stress jobs only and would be absent more than four days a month. (*Id.* at 648)

On March 15, 2011, non-examining state agency physician J. Johnston, M.D., conducted a RFC assessment of Tucker's file and agreed with Dr. Totoonchie that Tucker could perform a range of light work. (*Id.* at 552-59) Dr. Johnston diagnosed Plaintiff with degenerative joint disease in the left knee and CRPS in her right great toe. (*Id.* at 552) The doctor indicated that Tucker could occasionally lift 20 pounds, frequently lift ten pounds, stand for at least two hours, and sit for at least six hours in an eight-hour workday with normal breaks. (*Id.* at 553) The doctor also remarked that Tucker retained unlimited ability to push and pull with upper and lower extremities. (*Id.*) Postural limitations were all occasional with the exception that she was never to climb a ladder, rope, or scaffold. (*Id.* at 554) No manipulative, visual, or communicative

8

limitations were indicated. (*Id.* at 555-56) The only environmental limitation that Dr. Johnston noted was that Tucker should avoid concentrated exposure to hazards. (*Id.* at 556) As an explanation of evidence that supported the exertional limitations, Dr. Johnston noted only that Tucker's degenerative joint disease in her left knee and CRPS in her great right toe limited her standing and walking capability, that she uses analgesics and a cane, and that she had a sympathetic nerve block. (*Id.* at 553) Dr. Johnston made no notes on whether Tucker's symptoms were attributable to a medically determinable impairment or whether the severity or duration of the symptoms were disproportionate to the expected severity of Tucker's symptoms. (*Id.* at 557) Dr. Johnston likewise offered no comment on whether the severity of Tucker's symptoms and their alleged effect on function were consistent with the total medical and nonmedical evidence. (*Id.*)

On March 21, 2011, Tucker visited Frank Falco, M.D., for a follow-up evaluation of her chronic pain syndrome. (*Id.* at 561) Dr. Falco noted that Tucker had decided to pursue the spinal cord stimulator (SCS) trial. (*Id.*) He also indicated that she walked with a coordinated and smooth antalgic gait, concentrated well, and was not easily distracted. (*Id.* at 562) Her physical examination showed normal muscle tone but atrophy in her right great toe, edema in the right foot and ankle, and skin color changes, coolness, and allodynia in the right foot. (*Id.* at 561-62)

On July 5, 2011, Tucker told Dr. Davis that she continued to have pain in her foot. (*Id.* at 684) Dr. Davis noted that Tucker received some relief from her joint pain with the injections but no relief for the RSD type pain. (*Id.*) Tucker had been unable to have the SCS procedure at that point due to cellulitis. (*Id.*) On the same day, Dr. Sing sent a letter to Tucker's attorney, Joseph Capitan, in which he took issue with Cigna's stance that the "'underlying diagnosis is unclear'."

9

(*Id.* at 649) He further disagreed with an assessment performed by an examiner (Dr. Kaplan) for Plaintiff's Workers' Compensation claim which suggested Tucker could work full-time from a seated position.[3] Dr. Sing asserted that Dr. Kaplan never physically evaluated Tucker, never tried to discuss Tucker's case with him, and wrongly made an assumption that Tucker's foot hurts only when she puts weight on it. (*Id.* at 649-50) ("I am not in agreement with Dr. Kaplan's assessment . . . [of] this patient, who was never physically evaluated by Dr. Kaplan, [who] continues with severe and unremitting pain in her right great toe and foot that is severely painful even when she is seated.")

On September 1, 2011, Tucker saw Dr. Davis for a check-up and complained that she continued to experience pain in her right foot and could no longer wear shoes because of it. (*Id.* at 641) She also informed Dr. Davis that the pain seemed to be spreading to her left foot. (*Id.*) Dr. Davis noted that Tucker had stopped a brief pain management treatment in Delaware and was taking Tramodol as needed. (*Id.*) He reported pain with palpation over the right first joint line, slight temperature changes, mild edema, and new hypersensitivity in her left foot. (*Id.*)

During her February 28, 2012 appointment with Dr. Davis, Tucker stated that she continued to feel pain in her right foot but that her current medications and the injections from Dr. Dworkin were helping. (*Id.* at 682)

Lastly, on April 9, 2012, Tucker visited Dr. Dworkin, who noted that although Tucker continued to have improvement after the sympathetic blocks, the improvement was not long lasting. He recommended radio-frequency sympathetic neurotomy in addition to continuing pain medication and therapy. (*Id.* at 635)

---

[3]Dr. Kaplan's report does not appear to be in the record.

10

####   d.      Depression

In his March 31, 2010 RFC assessment, Dr. Dworkin indicated depression and anxiety as associated psychological problems/limitations of Tucker's RSD/CRPS. (*Id.* at 334)

On August 14, 2010, Alan H. Peck, M.D., met with Tucker to conduct a psychiatric evaluation for Maryland Disability Determination Services. (*Id.* at 431-34) Dr. Peck diagnosed Tucker with post-traumatic stress disorder and severe depression. (*Id.* at 434) He believed that Tucker's emotionally traumatic life might be exacerbating her physical pain and recommended that she get treatment for depression. (*Id.*) He added that she was bright, had a good memory, and could perform simple step instructions. (*Id.* at 433)

On September 21, 2010, Michael Oidick, Ph.D., completed a Mental RFC Assessment. (*Id.* at 447-60) He determined that Tucker demonstrated the functional capacity mentally needed to complete tasks that involve multiple steps. (*Id.* at 459) He also noted that most of her restrictions were due to pain and physical status, though he believed her mood may affect her motivation. (*Id.*)

In his February 15, 2011 RFC Questionnaire, Dr. Sing indicated that Tucker experienced depression, anxiety, and a reduced ability to attend to and persist in tasks. (*Id.* at 646)

On March 22, 2011, Tucker underwent a second consultative psychological examination by Victoria A. Eyler, Psy.D. (*Id.* at 566-72) Dr. Eyler reported that Tucker exhibited an alert and responsive level of consciousness and that her attention, judgement, reasoning, and insight were intact. (*Id.* at 570-71) However, Dr. Eyler also noted that Tucker's depressive disorder symptoms would impact her ability to deal with stressful interpersonal interactions. (*Id.* at 571)

### e. Obesity

On the date of her hearing, Tucker testified that she was five feet six inches tall and weighed 210 pounds. She had a body mass index (BMI) of 33.9, which placed her in the obese category. (*Id.* at 20)

## 2. Administrative Hearing

Plaintiff's administrative hearing took place on June 5, 2012. (*Id.* at 28) Plaintiff testified and was represented by an attorney. (*Id.*) A vocational expert also testified. (*Id.*)

### a. Plaintiff's Testimony

At the hearing, Plaintiff testified that she was fifty-seven years old, five feet and six inches tall, and weighed 210 pounds. (*Id.* at 34-35) She had worked full-time as a claims processor at State Farm Insurance until September 2009, when the pain from her second surgery became unmanageable. (*Id.* at 39) Plaintiff then worked part-time with State Farm until December 2009. (*Id.* at 40)

Plaintiff testified that her most limiting health problem is constant pain in her right and left feet. (*Id.* at 41) She also said that she had started having hip pain that spread to the whole left leg after her most recent sympathetic block and radiofrequency treatment. (*Id.* at 46) Plaintiff said Dr. Dworkin identified it as a result of the RSD spreading and that it was to be expected. (*Id.*)

Regarding physical abilities, Plaintiff estimated that she could walk, with a cane, ten to 15 minutes without taking a break, stand for 15 to 20 minutes without a break, and sit for half an hour at most. (*Id.* at 48) Plaintiff further testified that she used stairs with difficulty, could not bend forward or kneel down, and could comfortably lift only five pounds or less. (*Id.* at 49) She said she had no problems with memory but experienced difficulty with concentration. (*Id.*)

12

Regarding daily activities, Plaintiff testified that she is able to take care of her personal grooming and clean her own bedroom and bathroom. (*Id.* at 50) Her daughter, with whom she lives, helps her with the laundry by bringing Plaintiff's clothes downstairs. (*Id.*) Plaintiff's daughter also cooks in the evening, but Plaintiff can make a sandwich and use the microwave. (*Id.*) Plaintiff testified that she can drive herself for trips under five minutes. (*Id.* at 51) Her daughter does most of the grocery shopping and takes her to dinner; her son takes her to church on Sundays. (*Id.*) Plaintiff said she rotates and moves around during the service. (*Id.*)

Plaintiff used to like to go outside but now spends most of her days sleeping and watching TV. (*Id.* at 52) She explained that she sits in a La-Z-Boy recliner so that she can rotate positions easily and keep her feet elevated at heart level. (*Id.* at 54-55) Plaintiff said her foot pain wakes her up every night so that she sleeps a total of four hours. (*Id.* at 49)

Plaintiff reported that she is in constant pain. (*Id.* at 59) She testified that she cannot find a position that alleviates the pain and has difficulty finishing tasks because of it. (*Id.*) She also added that she gets depressed because she "can't do anything" and frustrated because she has always been independent. (*Id.*)

### b.    Vocational Expert's Testimony

A vocational expert (VE) also testified at the hearing. (*Id.* at 60) The VE classified Plaintiff's past work history as a claims processor as light exertional work. (*Id.*) The ALJ posed the following hypothetical to the vocational expert:

> [T]his is an individual who's approximately the claimant's stated age at the amended onset date, which is about 53 years, has a high school and two year college degree, is able to read and write and do at least simple math, defined as adding and subtracting. There are certain underlying

impairments that place limitations on the ability to do work related activities. In this hypothetical: the lifting is at a light level exertion; stand and walk about two hours in an eight hour work day; sit about six; in general, this person would have limited pushing and pulling with the legs; postural are all occasional, but no climbing of a ladder, rope or a scaffold; should avoid concentrated exposure environmentally to hazards and extreme cold. With this hypothetical, in your opinion, could such a person do any of claimant's past relevant work?

(*Id.* at 61) In response, the VE testified that the past work of claim processor, data entry clerk, and insurance clerk would be feasible with the hypothetical limitations. (*Id.* at 61-62) When asked what impact the use of a cane would have, the VE responded that it would have no impact since the positions are performed seated. (*Id.* at 62)

During examination by Tucker's counsel, the VE stated that if the employee were limited to sitting for two hours and standing for two hours in an eight hour day, could occasionally lift ten pounds and would require two days of absence per month, then work would be precluded. (*Id.* at 63-64) The VE agreed that if the employee would need to be off task 20 percent of the time while at work this person would not be able to perform any type of past relevant work. (*Id.* at 63-64) Additionally, the VE stated that if an employee like Plaintiff had a sedentary work capacity but needed to elevate her legs to heart level for 40 percent of the day during work time then work would be precluded. (*Id.* at 64) Lastly, the VE testified that if an employee were to need three to four additional unscheduled breaks in the day lasting ten to 15 minutes the individual would be unable to perform any substantial gainful activity. (*Id.*)

### 3. The ALJ's Findings

On June 26, 2012, the ALJ issued the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.     The claimant has not engaged in substantial gainful activity since May 4, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: injury to right foot with reflex sympathetic dystrophy pain, and obesity (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526)

5.     . . . [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except limited to pushing/pulling with legs; no climbing of ropes, ladders, or scaffolds; no more than occasional postural maneuvers; must avoid concentrated exposure environmentally to hazards and extreme cold; and would require the use of a cane.

6.     The claimant is capable of performing past relevant work as an insurance claims processor, data entry clerk, and insurance clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from May 4, 2009, through the date of this decision (20 CFR 404.1520(f)).

(Tr. at 19-26)

## III.     LEGAL STANDARDS

### A.     Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted). If the Court is able to determine that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

## B. Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner

16

for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. *See* 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3). A claimant is disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(l)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-23 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 CFR § 416.920; *Russo v. Astrue*, 421 Fed. App'x. 184, 188 (3d Cir. Apr. 6, 2011). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 CFR § 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 CFR § 416.920(a)(4)(I) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 CFR § 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 CFR § 416.920(a)(4)(iii). When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 CFR § 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 CFR § 416.920(e).

18

At step four, the Commissioner determines whether the claimant retains the residual

functional capacity ("RFC") to perform her past relevant work. *See* 20 CFR § 416.920(a)(4)(iv)

(stating claimant is not disabled if able to return to past relevant work). A claimant's RFC is "that

which an individual is still able to do despite the limitations caused by his or her impairment(s)."

*Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of

demonstrating an inability to return to her past relevant work." *Plummer v. Apfel*, 186 F.3d 422,

428 (3d Cir. 1999) (internal citation omitted). If the claimant is unable to return to her past

relevant work, step five requires the Commissioner to determine whether the claimant's

impairments preclude her from adjusting to any other available work. *See* 20 CFR

§ 416.920(a)(4)(v) (mandating finding of non-disability when claimant can adjust to other work);

*Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the

claimant is capable of performing other available work before denying disability benefits. *Id.* at

428. In other words, the Commissioner must prove that "there are other jobs existing in

significant numbers in the national economy which the claimant can perform, consistent with

[her] medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this

determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments.

*See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### B.     Tucker's Argument on Appeal

Plaintiff contends that the ALJ (1) failed to give appropriate deference to Tucker's treating

physicians and (2) failed to account for all of the functional limitations stemming from Tucker's

impairments. (D.I. 10 at 1) The Court finds the ALJ did not adequately justify her decision to

give little weight to the opinions of Plaintiff's treating physicians, Drs. Sing and Dworkin, and

great weight to the opinions of the non-examining, non-treating physicians. The Court also agrees that the ALJ's RFC did not properly account for Plaintiff's limitations. Accordingly, the Court will remand this matter to the Commissioner for further proceedings.

### 1. Treating Physician Doctrine

Plaintiff argues that the ALJ failed to give controlling weight to her treating physicians, in violation of the treating physician doctrine. Specifically, Tucker points to the RFC assessments of her treating physicians, Dr. Sing and Dr. Dworkin, in addition to two letters from Dr. Sing, all of which suggest that Tucker is incapable of working on a regular and continuing basis. (*Id.* at 8-10) Plaintiff contends that these medical opinions are supported by office notes and are consistent with the record. (*Id.* at 11)

Defendant responds that the ALJ correctly assigned little weight to Drs. Dworkin and Sing's assessments and Dr. Sing's letters since they were opinions on whether a patient is able to work. Defendant argues that the ultimate determination of disability is reserved to the Commissioner, not the physicians. (D.I. 13 at 13) Additionally, Defendant contends that the treating physicians' opinions were unsupported by the medical evidence, and/or relied too heavily on Plaintiff's subjective complaints. (*Id.* at 12-13)

The Third Circuit subscribes to the "treating physician doctrine." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). In accord with this doctrine, a treating physician's opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with the other substantial evidence in the record." *Fargnoli*, 247 F.3d at 43. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

20

U.S. 389, 401 (1971); *see also Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).

It is not for this Court to reweigh the medical opinions in the record but rather to determine if there is substantial evidence to support the ALJ's weighing of those opinions. *See Monsour*, 806 F.2d at 1190. Where detailed regulations prescribe the process an ALJ must follow in determining the weight to give particular evidence, the Court can and should remand for further proceedings if it appears the ALJ failed to follow these procedures. *See generally Jopson v. Astrue*, 517 F. Supp. 2d 689, 702 (D. Del. 2007).

In determining disability eligibility, the ALJ must accord treating physicians' reports "great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer*, 186 F.3d at 429 (internal citation omitted). Thus, an ALJ may reject a treating physician's opinion "only on the basis of contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). It follows that an ALJ cannot reject a treating physician's opinion "for no reason or for the wrong reason." (*Id.* at 317) More specifically, the ALJ "cannot disregard the opinion of a treating physician without referencing objective medical evidence conflicting with the treating physician's opinion and explaining the reasoning for rejecting the opinions of the treating physician." *Dass v. Barnhart*, 386 F.Supp.2d 568, 576 (D. Del. 2005). When an ALJ's decision is to deny benefits, the notice of the determination must contain specific reasons for the weight given to the treating source's medical opinion and support from substantial evidence in the case record. *See* SSR 96-2P. The determination must make clear to any subsequent reviewers the weight the adjudicator gave the treating source's medical opinion and the reasons for that weight. (*Id.*)

"A decision not to give a treating physician's opinion controlling weight must not

21

automatically become a decision to give a treating physician's opinion no weight whatsoever." *Gonzales v. Astrue*, 537 F.Supp.2d 644, 660 (D. Del. 2008). If a treating physician's opinion is not given controlling weight, the ALJ should consider numerous factors in determining the weight to give it, including: the length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by relevant medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *See* 20 CFR § 416.1527(d)(3)-(5). However, it is important to note that "in many cases, a treating source's medical opinion will be entitled to greatest weight and should be adopted even if it does not meet the test for controlling weight." *See* SSR 96-2P.

Here, the ALJ accorded "little weight" to the opinions expressed by Drs. Sing and Dworkin on the grounds that the issue of disability is reserved to the Commissioner. (Tr. at 25) The ALJ further added that these treating physicians' assessments were not supported by objective medical evidence but were "heavily influenced" by Tucker's subjective complaints. (*Id.* at 25-26) The ALJ found Tucker's complaints not credible on the ground that Tucker's ADLs "reflect a higher level of functioning" (*id.* at 26) and "other factors undermine the credibility of her subjective complaints" (*id.* at 25).

The Court finds that the record lacks substantial evidence to support the ALJ's decision to give Plaintiff's treating physicians' opinions "little weight." While the ALJ recounted much of Plaintiff's medical history, the ALJ did not explain in what way the objective medical evidence failed to support the opinions of Drs. Sing and Dworkin. She made no reference to any objective evidence that was inconsistent with the treating physicians' opinions. Instead, the ALJ questioned the credibility of Plaintiff's subjective complaints. The Court recognizes its obligation to avoid

second-guessing the ALJ's credibility judgments. However, the Court also understands that an ALJ may not "disregard [a treating physician's] medical opinion based solely on [the ALJ's] own amorphous impressions, gleaned from the record and from . . . evaluation of [a claimant's] credibility." *Morales* 225 F.3d at 318.

Although the ALJ faulted Tucker's treating physicians for relying too heavily on Tucker's subjective complaints of pain, these complaints are consistent throughout the record and are consistent with Tucker's diagnosis. Where objective medical evidence indicates that a claimant has a condition that reasonably could produce the pain the claimant describes, there is no requirement that a claimant produce objective evidence of the pain itself. *See Gonzales,* 537 F.Supp.2d at 665. Here, the ALJ found that Tucker has severe pain in her great right toe and that her treating physicians have indicated that the physiological cause of her pain is CRPS. (Tr. at 22) Moreover, the State agency physicians agreed with the CRPS diagnosis. (*Id.* at 439) An RSDS/CRPS diagnosis "requires the presence of complaints of persistent, intense pain that results in impaired mobility of the affected region." SSR 03-2P. Tucker complained of severe pain every time she saw a doctor, including those who examined her mental health. Many of her doctors noted immobility of her great right toe (Tr. at 472, 493, 328), in addition to other signs and symptoms of CRPS – including allodynia or hypersensitivity (*id.* at 492, 493, 562, 641), changes in skin temperature (*id.* at 472, 562, 641) and color (*id.* at 478, 492, 562, 656), swelling (*id.* at 367, 429, 436, 478, 562, 641), and bone demineralization (*id.* at 430). Notably, the record contains no evidence that *any* of the doctors who examined Tucker questioned the level of pain she experienced or the validity of her responses to diagnostic tests.

The ALJ relied on two elements of Plaintiff's record to find that Plaintiff's assertions as to

23

the severity of her pain are not credible. (*Id.* at 25) First, the ALJ pointed to the fact that Tucker
continued to receive injections despite her claims that they provided no relief. (*Id.*) When read as
a whole, however, the record suggests that Tucker had mixed experiences with the injections but
continued to use them as one part of a broader pain management regimen – and did so in reliance
on the advice of her treating physicians. Notes from Plaintiff's doctors suggest that the
sympathetic lumbar blocks and dextrose injections relieved some of Tucker's pain but not all of it
and not permanently. (*See id.* at 472 (Dr. Dworkin noting that Tucker had significantly improved
with help of lumbar blocks but much of her pain had recurred); *id.* at 483 (Dr. Cohen noting that
Tucker felt she was not seeing any "real changes" from injections); *id.* at 684 (Tucker explaining
to Dr. Sing that injections relieved some of her joint pain but not her RSD type pain); *id.* at 635
(Dr. Dworkin noting Tucker continued to have improvement following sympathetic blocks, but
effects do not appear to be long lasting)) When Tucker experienced some pain relief from the
injections, the doctors who had observed her varying degrees of success recommended that she
continue with the injections. (*See id.* at 429) (Dr. Cohen recommending continued epidural
treatment); *id.* at 682 (Dr. Davis encouraging her to return to Dr. Dworkin))[4]

It further appears that the ALJ may not have distinguished among the different types of
injections Plaintiff received, failing to account for the possibility that one type of injection proved
more helpful to Plaintiff than others. (*See, e.g.*, Tr. at 25, 42-43 (ALJ suggesting all injections

---

[4]The record shows that in the course of her pain treatment Plaintiff regularly received two
types of injections and also tried Flexor patches, Mobic, Vicodin, Tramadol, Tylenol, Lyrica,
Pennsaid, a Ketamine solution, a TENS machine, aqua therapy, and radio frequency. At the time
of her hearing, Plaintiff was taking Vicodin, Tylenol, and Tramadol. (Tr. at 43) There is
substantial evidence in the record to support a finding that Plaintiff was pursuing all possible
routes of pain relief suggested to her.

24

might be "lump[ed] . . . together") In sum, the Court finds a lack of substantial evidence in the record to support the ALJ's finding that Plaintiff's continued use of injections undermined the credibility of Plaintiff's subjective complaints of pain.

Second, the ALJ took issue with Tucker's claims that recently the pain had spread to her left foot, finding no medical evidence to support Tucker's complaint. (*Id.* at 25) The ALJ's analysis does not expressly address the possibility that, given Plaintiff's CRPS diagnosis, "complaints of pain can further intensify, and can be reported to spread to involve other extremities." SSR 03-2P. The ALJ provides no reason as to why it may have been expected that Plaintiff (if being truthful) would have experienced pain in her left foot earlier than when Dr. Davis documented mild hypersensitivity in Plaintiff's left foot.[5] There is not substantial evidence in the record to support the ALJ's finding that Tucker's complaints about pain in her left foot undermine the credibility of Tucker's subjective complaints of pain.

Additionally, the ALJ placed emphasis on Tucker's daily activities, recounting the following as evidence that Tucker can function despite her impairments:

> [S]he lives with her adult daughter, who generally prepares, the meals, but claimant can make simple meals. [sic] She maintains a driver's license and drives. She has medication side effects that interfere with her ability to focus. She can keep her bedroom and bathroom clean, make her bed an change her sheets, do her laundry if her daughter carries the basket, go grocery shopping, take care of her finances, eat out and go to the beauty parlor occasionally, and use the home computer. [sic] She attends church on Sundays.

(Tr. at 24-25) This recounting, however, is incomplete and not, *in toto*, supported by substantial evidence.

---

[5]There is evidence in the record that Plaintiff complained of pain in her left foot in September 2009. (*See* Tr. at 411; D.I. 13 at 17)

For example, Tucker stated that she drives only if the destination is less than five minutes away and even then only twice a month. (*Id.* at 51, 182) This is not substantial evidence for a seemingly broader finding that Tucker "drives." Plaintiff's daughter does most of the grocery shopping and her son drives her to church. (*Id.* at 51) To the extent the ALJ made broader findings that Tucker "go[es] grocery shopping" and "attends church," without recognizing the further, constrained context of Tucker's activities, the ALJ's findings are again not supported by substantial evidence. Similarly, Tucker testified that she can make a sandwich but her daughter does most of the cooking (*id.*), did not testify that she goes to the beauty parlor, can do her laundry only if her daughter brings her clothes downstairs for her (*see id.*), and while she can bathe herself, she no longer takes tub baths and is increasingly reliant on bowl washing (*see id.* at 180). An ALJ is permitted to weigh a claimant's ADLs in making a determination of disability, but it is important to remember that "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981). Further, "it is improper for an ALJ to disregard a treating physician's medical opinion based solely on his own impression of the record and his evaluation of a claimant's credibility." *Dougherty v. Astrue*, 715 F.Supp 2d 572, 583 (D. Del. 2010) (citing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000)). Thus, the ALJ has failed to demonstrate that the opinions of Tucker's treating physicians are not well-supported with objective medical evidence or are inconsistent with other substantial evidence in Plaintiff's record.

The ALJ is required to consider the length of the treatment relationship as well as the level of knowledge the medical source has about the claimant's impairments. *See* 20 C.F.R. § 404.1527(c). The record demonstrates that Dr. Sing is a specialist who treats RSD patients on a

regular basis (Tr. at 255), Dr. Dworkin is a certified physiatrist and pain medicine physician (*id.* at 670), and they treated Tucker from July 2009 and January 2010, respectively (*id.* at 669-70). The ALJ did not provide any analysis of these factors. The ALJ's decision to give the opinions of Plaintiff's treating physicians "little weight" is unsupported by substantial evidence.

The ALJ also failed to provide adequate support for her decision to give "great weight" to the State agency medical opinions. *See Gonzales*, 537 F.Supp.2d at 663 ("The opinions of non-treating physicians must be examined for whether, and how well, these opinions take account of and explain all of the other evidence in the record, including the opinions of treating physicians."). An applicable regulation states:

> [B]ecause nonexamining sources have no examining or treating
> relationship with you, the weight we will give their opinions will
> depend on the degree to which they provide supporting explanations
> for their opinions. We will evaluate the degree to which these
> opinions consider all of the pertinent evidence in your claim,
> including opinions of treating and other examining sources.

20 C.F.R. § 416.927.

The ALJ accorded "great weight" to the State agency physicians – Drs. Totoonchie and Johnston – reasoning that "they are consistent with each other, supported by objective medical evidence, and consistent with the claimant's activities of daily living." (Tr. at 26) However, the ALJ did not explain what aspects of the objective medical evidence supported the opinions of the State agency doctors.

Nor do the doctors' assessments themselves provide such an explanation. Dr. Totoonchie, in attempting to explain how and why the evidence supports his conclusions regarding Plaintiff's exertional limitations, listed the alleged onset date, Tucker's age, her allegations, her education

27

level, and her past work. (*Id.* at 440) Dr. Johnston noted Tucker's age, her diagnosis – which he wrote "limit[s] her standing and walking capability" – that she uses analgesics and a cane, and that she had a sympathetic nerve block. (*Id.* at 553) In response to a question about (1) whether Tucker's symptoms were attributable to a medically determinable impairment, (2) whether the severity or duration of the symptoms was disproportionate to the expected severity or duration, and (3) whether the severity of the symptoms and their alleged effect on function was consistent with the total medical and nonmedical evidence, Dr. Totoonchie summarized Plaintiff's and her mother's accounts of Tucker's ADLs and wrote "ADLs credible." (*Id.* at 444) Dr. Johnston wrote no notes. (*Id.* at 557) Lastly, when asked for additional comments, Dr. Totoonchie merely listed some of the highlights of Plaintiff's medical history. (*Id.* at 446) Dr. Johnston wrote no notes. (*Id.* at 559) Neither of these non-examining physicians explained why they rejected the opinions of the treating physicians.

Indeed, it may be that neither of the State agency doctors even considered the views of the treating physicians, as both marked on their forms that a medical source statement regarding claimant's physical capacities was not included in the file they reviewed. (*Id.* at 445, 558) This is despite the fact that Dr. Dworkin's RFC assessment was submitted on March 31, 2010, five months before Dr. Totoonchie's assessment; and Dr. Sing's RFC assessment was submitted on February 15, 2011, one month before Dr. Johnston's report.

The ALJ did not address these discrepancies in the State agency physicians' reports. The "great weight" that the ALJ gave their opinions is at odds with their failure to provide supporting explanations for their opinions and their lack of consideration of the opinions of Plaintiff's treating physicians.

## 2. RFC Determination

Plaintiff also argues the ALJ failed to account for all of the functional limitations stemming from her impairments. The Court agrees that the ALJ's determination of residual functional capacity did not reflect all limitations. The ALJ found that Tucker has a residual functional capacity for "light work as defined in 20 CFR 404.1567(b) except limited to pushing/pulling with legs; no climbing of ropes, ladders, or scaffolds; no more than occasional postural maneuvers; must avoid concentrated exposure environmentally to hazards and extreme cold; and would require the use of a cane." (Tr. at 21)

According to 20 CFR 404.1567(b),

> [A] job is in [the light work] category when it requires a good deal of walking, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, *you must have the ability to do substantially all of these activities.*

(Emphasis added)

In the hypothetical directed to the VE, the ALJ limited the amount of required standing and walking to two hours in an eight hour day. However, a job in the light work category may require "a good deal of walking." Moreover, the ALJ's RFC does not account for the persistent pain Tucker experiences, her consequent need to elevate her foot for long portions of the day, or her difficulties with attentiveness due to the pain. (*See, e.g.*, Tr. at 218-19, 457, 461, 561, 569) Additionally, the ALJ based the hypothetical on a 53 year-old individual. Plaintiff was 57 at the time of the ALJ's decision. As Plaintiff argues in her briefs, a person limited to light work is disabled if over the age of 55 (*see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2, Rule 202.06) – a contention with which the Commissioner does not appear to disagree.

For all of these reasons, this matter will be remanded to the Commissioner.

V.    **CONCLUSION**

For the reasons given above, the Court will grant Plaintiff's motion for summary judgment and deny Defendant's motion for summary judgment. The matter will be remanded to the Commissioner. An appropriate Order follows.